IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MONARCH LIFE INS. CO.          :          CIVIL ACTION
                               :
          v.                   :
                               :
ESTATE OF ROBERT TARONE, III,  :          NO. 09-734
et al.

MEMORANDUM

Dalzell, J.                                    January 26, 2010

          Monarch Life Insurance Company ("Monarch") sues the

defendants in this statutory interpleader action to determine the

proper beneficiary of an annuity for which the late Robert

Tarone, III ("Tarone") was the annuitant. Tarone's Estate and its

Executor, James P. McEvilly, Jr. (collectively the "Estate"), and

Tarone's sister, Laura Sipio, have both made claims against

Monarch for the remaining annuity payments, and Monarch asks us

to resolve this dispute. The Estate and Sipio have moved for

summary judgment. For the reasons we discuss below, we will deny

both motions.[1]

_____

          [1] The Estate makes a one-sentence argument that Sipio
does not have standing in this litigation because she was not a
party to the underlying settlement agreements and is not the
beneficiary of the Policy at issue. Estate Br. at ¶ 21. But
whether Sipio is the beneficiary is the central question in this
case. We will not belabor our discussion of this toss-off and
unsupported argument.

I.      **Factual Background**

        A.      **Settlement of Prior Dispute**
                **and Creation of the Annuity**

        In 1980 Tarone was injured in a motorcycle accident. He

thereafter signed a Settlement Agreement and Release with

Transamerica Insurance Company -- as insurer for the defendants

in that case -- to resolve the claims that arose from that

accident. Settlement Agreement and Release, August 1, 1984, Sipio

Ex. 1[2] ("Settlement Agreement"). Under the terms of the

Settlement Agreement, Tarone would receive certain monthly

payments for the remainder of his life, and those payments were

guaranteed for a minimum of 360 months. Id. at ¶ 2(c). The

Settlement Agreement stated that if Tarone died before the end of

those 360 months, "the remaining monthly payments in the

guaranteed period shall continue to be paid monthly to the estate

of Plaintiff [Tarone] as they fall due and not in a lump sum."

Id.

        The parties to the Settlement Agreement agreed that

Transamerica could fund its liability to Tarone by purchasing an

---

        [2] Sipio and the Estate submitted many of the same
documents in support of their motions. We refer to Sipio's
exhibits because the Estate stipulates to Sipio Exhibits 1
through 9, with the exception of Exhibit 6. Estate Resp. Br. at
9. Exhibit 6 is a policy change form, which we discuss below.

annuity policy from Monarch. <u>Id.</u> at ¶ 5. Under the terms of the

Settlement Agreement, "[t]he Transamerica Insurance Company

and/or the assignee [which became Monarch] shall be the owner of

any such annuity policy, may hold any such annuity policy and

shall have all rights of ownership." <u>Id.</u>

The same day the Settlement Agreement was signed,

Tarone, Better Materials, Inc. -- apparently one of the

defendants in Tarone's motorcycle accident lawsuit -- and Monarch

Capital Corporation entered into a "Qualified Assignment and

Consent" agreement. Qualified Assignment and Consent, August 1,

1984, Sipio Ex. 2 ("Qualified Assignment"). Under the terms of

<u>that</u> agreement, Better Materials, Inc. assigned, and Monarch

assumed, the liability to make the payments that ¶ 2 of the

Settlement Agreement required. Qualified Assignment at ¶ 1.

Tarone released Better Materials from its obligations under the

Settlement Agreement and agreed that he "may not anticipate,

sell, assign or encumber any of said payments." <u>Id.</u> at ¶ 3.

Monarch Capital could fund its obligations to Tarone by

"purchasing a 'qualified funding asset'" -- specifically, an

annuity policy from Monarch Life Insurance Company, the

stakeholder here -- that would be Monarch's "sole property." <u>Id.</u>

3

at ¶ 4. Under the terms of the Qualified Assignment, Tarone would "have no right or interest" in the annuity. See id.

Someone[3] filled out an Annuity Application and dated it August 2, 1984, and the "DATE OF ISSUE" and "POLICY DATE" are both August 3, 1984. Monarch Life Insurance Company, Annuity Policy ("Policy"), Annuity Application ("Application"), Sipio Ex. 3, at 3, 4-5. Tarone is listed as the "proposed annuitant" on the Application, and the "Estate of Annuitant - Robert J. Tarone, III" is the beneficiary for any death benefits. Id. at 4. The Application is part of the "entire contract" of the policy. Policy at 9 (stating that the "entire contract" consists of the policy, the application, and any attached endorsements). The Application included a box to identify the "owner of policy," and the two choices were "Proposed Annuitant" and "Applicant." Neither box was checked. Application, Policy at 4. On the second page of the Application, someone wrote "Personal Injury Case Do Not 1099." Id. at 5. It appears that representatives of Monarch Capital Corp. and Huver & Associates, Inc. signed the Application. Id.

---

[3] Tarone's signature is not on the application, and there is no evidence to suggest who completed the form.

The Policy states that "you refers to the annuitant shown below [Tarone]" and that "[y]ou are the owner of this policy unless another owner has been named in the application." Policy at 1, 9. The Application did not name another owner.[4] In a blank space on the first page of the Application someone wrote "See Attached Schedule of Payments," and the only document with that title is Exhibit A to the Settlement Agreement. See Settlement Agreement at ¶ 2(c); Schedule of Payments, Sipio Ex. 4. The policy states that it "is a contract between its owner and us [Monarch]." Policy at 9.

Regarding the beneficiary for death proceeds, which is at the heart of the dispute between Sipio and the Estate, the Policy states that "[t]he owner can reserve the right to change beneficiaries." Id. The Beneficiary section of the Application instructs the applicant to "Indicate beneficiary for any death benefits with.....right reserved to change beneficiary." Application, Policy at 4. Nothing is written in the blank space

---

[4] The Estate argues that the application does not specifically identify the owner and that the identity of the owner is unclear, but under the Policy's terms Tarone is the owner because the Application identifies no other owner.

above the dots between "with" and "right."[5] <u>See</u> <u>id.</u> The Policy states that "[d]uring your [Tarone's] lifetime the owner can transfer ownership of this policy or change the beneficiary. To do this, the owner must send us written notice of the change in a form satisfactory to us. The change will take effect as of the day the notice is signed. But the change will not affect any payment made or action taken by us before recording the change at our main office." <u>Id.</u> at 10.

The Annuity Policy provided that Monarch would pay income to Tarone during his lifetime and pay any death proceeds to his beneficiary. <u>Id.</u> at 1. Tarone would receive $550.10 monthly starting on September 3, 1984 "INCREASING AT 3% COMPOUNDED ANNUALLY WHILE THE ANNUITANT IS LIVING." Basic Policy Data, Policy at 3. The death proceeds were the monthly payments "UNTIL A TOTAL OF 360 PAYMENTS, INCLUDING THOSE PAYABLE PRIOR TO THE ANNUITANT'S DEATH, HAVE BEEN MADE." <u>Id.</u> There is no dispute that 360 payments had <u>not</u> been made before Tarone's death in 2008

---

[5] The Estate contends that the Application does <u>not</u> reserve the right to change the beneficiary, but the Application on its face shows otherwise. Someone could have written the word "no" in the space between "with" and "right," but no one did so. This section of the Application thus only supports the conclusion that the owner of the Policy <u>did</u> reserve the right to change the beneficiary under the Policy's terms.

and that some payments remain outstanding.[6] The policy also

provides for six "GUARANTEED PAYMENTS" of varying lump-sum

amounts. See id.[7]

## B. **Contract Change Form**

Atilla Aritan, who is Monarch's records custodian for

the Policy at issue here, certified that the insurer's original

file for the Policy included a Contract Change Form ("Change

Form") and a letter that Monarch sent to Tarone in response to

receiving that form. Certification of Atilla Aritan, Aug. 11,

2009, Sipio Ex. 11 at ¶¶ 1-2. According to Monarch's records, it

received the Change Form on December 11, 2000. Id. at ¶ 4.[8]

---

[6] Thus, the minimal diversity amount of 28 U.S.C. §
1335(a) is readily met. We also note in Sipio Ex. 4 that the
Schedule of Payments includes lump sum payments of $27,000 in
September of 2009 and $53,000 in September of 2014.

[7] The only amendment to the Policy -- which neither
party mentions in this case -- is that "The Right to Surrender is
Hereby Waived." Amendment of Application to Monarch Life
Insurance Company, Policy at 6. A representative of Huver &
Associates signed the amendment, and an unidentified person
signed in the box titled "OWNER (IF OTHER THAN APPLICANT)." See
id. No one signed the Amendment in the "APPLICANT" box.

[8] The Estate does not dispute Sipio's claim --
supported by Aritan's certification -- that these documents were
in Monarch's Policy files. But the Estate does challenge whether
or not Tarone signed the Change Form. The Estate has submitted no
evidence to support its claim that someone other than Tarone
signed the form, and McEvilly -- who knew Tarone for some time --
(continued...)

The Change Form is, to put it generously, confusing. It lists Tarone as the "Owner," but on the blank next to "Annuitants" is written "Joan A. Darlington (beneficiary)." Contract Change Form, Sipio Ex. 6 ("Change Form") at 1. Darlington was Tarone's mother. There is a dispute about the identity of the owner, but there is no question that Tarone -- not Darlington -- was the annuitant. And at least before this Change Form, the Estate -- not Darlington -- was the beneficiary. Darlington was, however, the first named beneficiary in Tarone's

---

[8] (...continued)
stated in his deposition that he did not know if the signature was Tarone's. McEvilly Dep. at 42-44.

Sipio, on the other hand, submitted the report of a forensic document expert who stated that it was his "opinion within a reasonable degree of scientific certainty that [Tarone's signature on the Change Form] was signed by the same person who signed the other Robert J. Tarone III signatures described as standards and that the questioned signature [on the Change Form] is a genuine Robert J. Tarone III signature." Report of William J. Ries, August 7, 2009, Sipio Ex. 12, at 3.

In responding to a motion for summary judgment, the Estate may not just spout unsupported allegations regarding the authenticity of Tarone's signature. It "must present affirmative evidence in order to defeat a properly supported motion for summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986). Because the Estate has not done so, for the purposes of these motions we will assume that Tarone signed the change form. But as we explain below, we need not definitively resolve this dispute now because the parties have failed to address preliminary issues that we must rule on before we discuss Tarone's purported beneficiary change.

will. Last Will and Testament of Robert J. Tarone, III ("Tarone Will"), Sipio Ex. 5.

In the Change Form section to mark the "Type of Change," the following boxes are checked: "Name Change," "Address Change," and "Beneficiary Designation." In the "Name Change" section, someone checked that the change was for the Annuitant but then wrote "(beneficiary)" next to that word. The form states that the "Name of beneficiary <u>before</u> change" was Joan Darlington and that the "Name of beneficiary <u>after</u> change" was Laura Sipio. <u>Id.</u> As the reason for the Name Change, the person filling out the Change Form wrote that "Joan A. Darlington died 11/11/00." <u>Id.</u> The "Address Change" is marked for the "Annuitant," but the address was changed from one for Joan Darlington to one for Laura Sipio -- neither of whom was the annuitant for the Policy. According to the Change Form, the "Annuity Commencement Date" should be changed to November 12, 2000. <u>Id.</u>

The second page of the Change Form is entirely devoted to the "Beneficiary Designation." <u>Id.</u> at 2. Unlike the first page, the writing on this side -- the heart of this dispute -- is clear. At the top of this page, a checked box shows that the beneficiary designation is for the "Owner's Beneficiary." <u>Id.</u> The first sentence in this section states that "[t]his beneficiary

designation cancels any and all prior beneficiary designations

and settlement agreements for the contract referenced on the

reverse side of this form," -- i.e., the Policy. Id. It instructs

that the person filling out the form should provide the

beneficiary's full name, address, relationship to the annuitant

or owner, and Social Security number. In the space under "Primary

Beneficiar(ies)," Laura Sipio's name, an address, and a Social

Security number are written. Id. The "Relationship" listed is

"sister." Id. Tarone's name appears on the line for the owner's

signature, and someone signed as a witness as well.[9] The form is

dated December 7, 2000.

Monarch wrote a letter to Tarone dated February 1,

2001, in which it stated that it received the Change Form but

could not change the beneficiary because "based upon the terms of

the Settlement Agreement, Specifically, the bottom of page 5, in

the event of your death before all guaranteed payments are made

_____

[9] Sipio contends that the witness's signature was that
of E. Dillon Darlington, who McEvilly says was an attorney who
was married to Tarone's mother and who referred Tarone to him for
legal services. See McEvilly Dep. at 7. McEvilly did not dispute
that the signature belonged to E. Dillon Darlington, id. at 53,
but Sipio has also presented no affirmative evidence that this is
the identity of the witness. In any event, we need not resolve
this disagreement because the identity of the witness to the
Change Form is not now a material issue.

the remaining guaranteed payments will be made to your estate."
Letter from Margie Bradbury to Robert Tarone, III, Feb. 1, 2001,
Sipio Ex. 7.

### C. **Tarone's Death, Will, and Creation of the Estate**

Tarone died on October 18, 2008, and McEvilly was
granted Letters Testamentary on November 21, 2008. Local
Registrar's Certification of Death, Sipio Ex. 8; Register of
Wills of Bucks County, Pennsylvania, Short Certificate, Sipio Ex.
9. Under Tarone's Will, the residue of his estate was to go to
his mother, but she died before him. Because Tarone's mother
predeceased him, the residue of his estate divides equally
between the Bucks County Association for the Blind and
Handicapped and the March of Dimes-Birth Defects Foundation -
Bucks County Chapter. See Tarone Will.

## II. **Analysis**[10]

---

[10] Summary judgment is appropriate if there is no
genuine issue of material fact and the moving party is entitled
to judgment as a matter of law. Fed. R. Civ. P. 56(c)(2). In
ruling on a motion for summary judgment, the Court must view the
evidence, and make all reasonable inferences from the evidence,
in the light most favorable to the nonmoving party. Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Whenever a
factual issue arises that cannot be resolved without a
credibility determination, at this stage the Court must credit
(continued...)

The Estate and Sipio argue that we should apply their favored agreement and let the chips fall where they may. The Estate contends that the provisions in the Settlement Agreement and Qualified Assignment ("Settlement Documents") control the Policy. Under the terms of the Settlement Documents, Monarch owns the Policy and the death proceeds are to go to the Estate. The Estate argues that (1) Tarone did not own the Policy and thus

---

[10] (...continued)
the non-moving party's evidence over that presented by the moving party. Id. at 255.

The moving party bears the initial burden of proving that there is no genuine issue of material fact in dispute. Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585 n.10 (1986). Once the moving party carries this burden, the nonmoving party must "come forward with 'specific facts showing there is a genuine issue for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The non-moving party must present something more than mere allegations, general denials, vague statements, or suspicions. Trap Rock Indus., Inc. v. Local 825, 982 F.2d 884, 890 (3d Cir. 1992); Fireman's Ins. Co. of Newark v. DuFresne, 676 F.2d 965, 969 (3d Cir.1982). It is not enough to discredit the moving party's evidence; the non-moving party is required to "present affirmative evidence in order to defeat a properly supported motion for summary judgment." Liberty Lobby, 477 U.S. at 257 (emphasis in original). A proper motion for summary judgment will not be defeated by merely colorable or insignificantly probative evidence. See id. at 249-50. Also, If the non-moving party has the burden of proof at trial, then that party must establish the existence of each element on which it bears the burden. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

could not change the beneficiary[11]; and (2) Tarone could not

change the beneficiary because the Settlement Documents prevented

him from doing so. Sipio, on the other hand, contends that the

Settlement Documents do _not_ control the Policy and that we should

read the Policy without reference to the Settlement Documents.

Under the _Policy_'s terms, she argues that Tarone was the owner

and retained the right to change the beneficiary. Sipio also

claims that Tarone substantially complied with Monarch's

requirements for changing the beneficiary to Sipio and that it

was his clear intent to do so.[12]

Our task is one of contract interpretation, so we will

begin with a brief overview of those principles under

Pennsylvania law. Because it is plain that material terms of the

Policy directly conflict with those in the Settlement Documents,

---

[11] At his deposition, McEvilly said that he did not
know who the owner of the Policy was, but he thought the owner
was whoever paid the annuity premium. McEvilly Dep. at 23, 29.

[12] There is no dispute that Pennsylvania law governs
the interpretation of the contracts at issue in this interpleader
case.

Under Pennsylvania law, one seeking to change a policy
beneficiary does not need to strictly comply with the policy's
requirements. "Substantial compliance with policy provisions is
sufficient. All that is required is that every reasonable effort
under the circumstances be made to effect the change." Provident
Mut. Life Ins. Co. of Phila. v. Ehrlich, 508 F.2d 129, 133 (3d
Cir. 1975).

we will then address the question of how -- if at all -- these
contracts interact.

## A. Contract Interpretation Under Pennsylvania Law

The goal of contract interpretation is to determine the
intent of the parties at the time they made the contract.
Commonwealth v. Manor Mines, Inc., 565 A.2d 428, 432 (Pa. 1989).
"[W]hen a written contract is clear and unequivocal, its meaning
must be determined by its contents alone," and we give effect to
all contract provisions. Id. But if the contract is ambiguous,
then the factfinder may look to parol evidence to determine the
parties' intent. Penn Twp. v. Aetna Cas. & Sur. Co., 719 A.2d
749, 751 (Pa. Super. 1998). "A term is ambiguous if it can have
two or more reasonable meanings." Martin v. Monumental Life Ins.
Co., 240 F.3d 223, 233 (3d Cir. 2001) (applying Pennsylvania
law). If the parol evidence is "unfruitful" in resolving the
interpretation issues, we then turn to rules of construction.
Penn Twp., 719 A.2d at 751.

If the contract terms are ambiguous and we review
extrinsic evidence, interpretation of the contract -- determining
the parties' intent -- is a question of fact "unless the
extrinsic evidence is conclusive." Martin, 240 F.3d at 233, cited

in American Eagle Outfitters v. Lyle & Scott, Ltd., 584 F.3d 575, 587 (3d Cir. 2009). See also Gonzalez v. U. S. Steel Corp., 398 A.2d 1378, 1385 (Pa. 1979) (the trier of fact should determine the interpretation of an agreement "if it depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence"); Comm. Coll. of Beaver County v. Comm. Coll. of Beaver County, Soc. of the Faculty (PSEA/NEA), 375 A.2d 1267, 1275 (Pa. 1977) (the jury generally resolves fact questions related to ambiguous writings).

### B. Interaction of the Policy With the Settlement Agreement and Qualified Assignment

Sipio argues that the Settlement Documents have no bearing on the Policy and that the Policy superseded the Settlement Documents. She claims that the Policy and Change Form "were fully enforceable, separate and distinct contracts, executed later in time to the Settlement Agreement." Sipio Br. at 23. The Estate contends that the Settlement Documents control the Policy. We disagree with the parties' one-sided approaches, and we will deny both motions for summary judgment because neither "movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).

Under Pennsylvania law, "'[w]here several instruments are made as part of one transaction they will be read together, and each will be construed with reference to the other; and this is so although the instruments may have been executed at different times and do not in terms refer to each other.'" Huegel v. Mifflin Const. Co., Inc., 796 A.2d 350, 354-55 (Pa. Super. 2002) (quoting Neville v. Scott, 127 A.2d 755, 757 (Pa. Super. 1957)). It makes no difference if the parties to each contract are different; the key is that the contracts are "executed at the same time and involve the same transaction." Black v. T. M. Landis, Inc., 421 A.2d 1105, 1107 (Pa. Super. 1980). When several agreements are made as part of a single transaction but are executed at different times, we must construe them together. CGU Life Ins. Co. of America v. Metro. Mortg. & Sec. Co., 131 F.Supp. 2d 670, 675 (E.D. Pa. 2001) (Joyner, J.)(applying Pennsylvania law). Agreements that contain integration clauses must still be read together if they are part of the same transaction. Kroblin Refrigerated Xpress, Inc. v. Pitterich, 805 F.2d 96, 108 (3d Cir. 1986) (citing, e.g., Neville, 127 A.2d at 757).

In CGU Life, as here, parties to a prior dispute signed a settlement agreement and qualified assignment, and then purchased an annuity to fund the settlement agreement. CGU Life,

16

131 F.Supp.2d at 672-3. All of these contracts were made within three weeks, and Judge Joyner concluded that they "all clearly were made as part of one transaction as none of these documents would have been executed save for the others." <u>Id.</u> at 675. He then examined all three agreements and, unlike the situation here, concluded that there were no ambiguities among them. <u>Id.</u>

Applying these principles, the Settlement Documents and Policy were part of the same transaction and must be read together. The Settlement Documents contemplated and approved the purchase of the Policy, and there is no dispute that the Policy was purchased by someone as a result of the Settlement Documents. The Settlement Documents and Policy Application were dated on consecutive days, and the fact that the parties to the agreements were slightly different makes no difference under Pennsylvania law. Under these circumstances, we must construe the Policy and Settlement Documents together.[13]

_____

[13] Sipio relies heavily on <u>Randall v. Travelers Cas. & Sur. Co.</u>, 145 P.3d 1048 (Ok. 2006), and the Estate argues that <u>Randall</u> does not apply here. We agree that <u>Randall</u> is inapposite as it is an opinion of the Oklahoma Supreme Court that, according to our research, has never been cited in an opinion outside of Oklahoma and the Tenth Circuit, much less in Pennsylvania or anywhere in the Third Circuit.

The settlement agreement in <u>Randall</u>, moreover, did not specify how the payments would be funded, whereas here the

(continued...)

## C.  Ambiguity and Who Should Resolve It

When read together, the terms of these contracts are, to say the least, "ambiguous".  Indeed, they are in outright conflict. Pursuant to the Settlement Documents, Transamerica owns the Policy, the death proceeds go the Estate, and Tarone (a non-owner of the Policy) could not assign any payments to anyone else. But according to the Policy, Tarone was the owner, and he could change the beneficiary from the Estate to his sister or anyone else.

Having concluded that these mutually exclusive agreements are ambiguous when read together, the next step under Pennsylvania law is to look to the nature of the parties' extrinsic evidence regarding the 1984 agreements and decide whether a judge or a jury should resolve the ambiguities and determine the parties' intent. A judge will resolve this issue if the extrinsic evidence is "conclusive" or if the parties agree on what the extrinsic evidence is but dispute the impact that it has

---

[13] (...continued)
Settlement Documents specifically approved the purchase of the Policy. See id. at 1051. The Randall settlement agreement also did not include an anti-assignment provision, and assignment was the primary issue in that case. Id. The agreements in this case have conflicting provisions regarding the key contested issues, to wit, identifying the Policy owner and determining who, if anyone, could change the Policy beneficiary.

on resolving the ambiguities. But if the parties disagree about the facts that comprise the extrinsic evidence, a jury will be the factfinder.[14]

Unfortunately, Sipio and the Estate do not explore in their motions and briefs how we should read these 1984 contracts together, and they neither make arguments nor present extrinsic evidence that we can evaluate to determine how to move forward from this point.[15] Both sides contend that we should apply their favored contract and ignore the other one. Sipio claims, for example, that "[t]he controlling documents in this case are the Monarch Life Insurance Company Annuity Policy and Monarch Life

---

[14] Sipio and the Estate both demanded a jury trial in their answers to Monarch's complaint.

[15] Sipio contends that the fact that Tarone received benefits during his lifetime, and that the Policy provides that the "owner" will receive benefits and be able to change the beneficiary, constitutes clear extrinsic evidence of the parties' intent that Tarone was the owner during his lifetime. But Tarone would have received benefits during his lifetime under either the Settlement Documents or the Policy, so this fact does not shed any light on this issue.

Sipio also contends that the Change Form exhibits Tarone's intentions about changing the beneficiary to Sipio. Sipio Resp. Br. at 5. But that argument assumes that Tarone could make a beneficiary change in the first place. Before we even reach the issues that surround the Change Form, we must determine the parties' intent when they made the underlying contracts in 1984 regarding who was the owner of the Policy and whether they intended for Tarone to have the power to unilaterally change the beneficiary.

Insurance Company Contract Change Form." Sipio Br. at 12 (citations omitted). She also invites us to reform the Policy due to the parties' mutual misconception or mistake, but she provides no evidence that there was a "mistake" here.

The Estate's approach is more direct: it declares without any supporting arguments or evidence that "[t]o the extent there may be a discrepancy between [the Policy and the Settlement Documents] the intentions of the contracting parties are determined by [the Settlement Documents]." Estate Resp. Br. at 9. The Estate also contends that the Settlement Documents did not expressly permit Tarone to change the beneficiary, but it does not even acknowledge the provisions on this topic in the Policy. See Estate Br. at ¶ 9.

## III.  **Interim Conclusion**

As we discuss above, we must look at the Settlement Documents and the Policy and read them together to determine the parties' intent. Because all three contracts were part of the same transaction, we may not simply pick one and enforce it alone. We will therefore deny both motions for summary judgment and order the parties to notify us regarding (1) whether they have completed discovery regarding any extrinsic evidence

surrounding the Settlement Documents and Policy which were

executed in 1984[16]; (2) if the parties have not done so, what

discovery they expect to need -- in detail -- and the minimum

time in which that can be completed; and (3) whether the Estate

and Sipio have <u>factual</u> disagreements regarding the extrinsic

evidence.  After receipt of this notification, we will consider

the best way forward.


                                        BY THE COURT:

                                        __\s\Stewart Dalzell

---

[16] We expect that the parties <u>have</u> completed such
discovery, but if they request additional time for it, we reserve
our decision about whether to permit it. We offer them the
opportunity to notify us about this issue so that we may make an
informed decision regarding how to move this case toward a swift
resolution.