IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MONARCH LIFE INSURANCE CO. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| ESTATE OF ROBERT J. TARONE, III; | : | |
| JAMES P. McEVILLY, JR., as | : | |
| EXECUTOR OF THE ESTATE OF | : | |
| ROBERT J. TARONE, III; and | : | |
| LAURA SIPIO | : | NO. 09-734 |

OPINION

JACOB P. HART                                          DATE:  May 10, 2011
UNITED STATES MAGISTRATE JUDGE

      This is an interpleader action filed by Monarch Life Insurance Co. to determine the proper beneficiary of an annuity upon the death of annuitant Robert Tarone, III, ("Tarone").  The claimants are the Estate of Robert J. Tarone, III, and James P. McEvilly as the executor of that estate, who are jointly represented ("the Estate"); and Laura Sipio, the sister of the deceased.  As explained below, this determination turns on whether Tarone, who died on October 18, 2008, was not just the annuitant, but also the owner of the annuity policy.

      Originally, this case was assigned to the Honorable Stewart Dalzell.  On January 26, 2010, he denied the claimants' cross-motions for summary judgment.  The case was later transferred to the undersigned pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. Pr. 73.  Trial was scheduled for April 4, 2011.  However, on March 29, 2011, the Estate moved for leave to file a second motion for summary judgment.  Leave was granted.  Sipio responded, and also filed a cross-motion for summary judgment.  For the reasons set forth below, I will now grant summary judgment in favor of the Estate.

I.  Factual and Procedural Background

A.  The Settlement Agreement and the Annuity Policy

On August 7, 1980, Tarone was involved in a motorcycle accident. Sipio's Pre-Trial Stipulation at ¶ 1. He sustained serious harm, including a traumatic brain injury. Id. Tarone retained James P. McEvilly, Jr., Esq., to represent him in his personal injury lawsuit against a number of defendants, including Better Materials, Inc. Id. at ¶¶ 2, 3.

On August 1, 1984, Tarone resolved the personal injury lawsuit by entering a written Settlement Agreement and Release ("SAR") with Transamerica Insurance Company, insurer for the defendants. Id. at ¶ 4. The SAR set forth Transamerica's obligations to Tarone, including monthly payments, which were to continue: "for the remainder of the life of Plaintiff, guaranteed for a minimum period of 360 consecutive months." SAR (Sipio's Exhibit 1) at ¶ 2(c).

The SAR further provided: "[I]n the event of the death of Plaintiff prior to the expiration of the said 360 months, the remaining monthly payments in the guaranteed period shall continue to be paid monthly to the estate of Plaintiff as they fall due and not in a lump sum." Id. The SAR also gave Transamerica the right to assign its liability to make the periodic payments, "within the meaning of § 130 of the Internal Revenue Code." Id. at ¶ 4.

Significantly for purposes of this decision, the SAR continued:

> The Transamerica Insurance Company and/or the assignee reserve the right to fund its liability to make periodic payments under paragraph 2(c) above through the purchase of an annuity policy from Monarch Life Insurance Co. **The Transamerica Insurance Company and/or the assignee shall be the owner of any such annuity policy, may hold any such annuity policy and shall have all rights of ownership.**

SAR at ¶ 5. (Bold supplied).

On the same day that the SAR was executed, Tarone entered a Qualified Assignment and Consent with Better Materials, Inc., defined there as "the Assignor", and Monarch Capital Corporation, defined there as "the Assignee." Qualified Assignment and Consent (Sipio's Exhibit 2). Tarone was defined as "the Obligee." Id. By means of this document, Better Materials, Inc., (and therefore its insurer, Transamerica) transferred to Monarch Capital Corporation its obligations to pay Tarone. Id.

The Qualified Assignment and Consent contained this language:

> Assignee may fund the liabilities it assumes hereby by purchasing a "qualified funding asset" within the meaning of Code Section 130(d). **Any such "qualified funding asset" shall be the sole property of Assignee; Obligee shall have no right or interest therein.**

Id. at ¶ 4. (Bold supplied).

Thus, these two documents, read together, provide that Monarch Capital Corporation ("Monarch Capital")– as the assignee for the personal injury defendants – was to fund its liability to pay Tarone by purchasing an annuity from Monarch Life Insurance Co. ("Monarch Life"). Monarch Capital would be the sole owner of the annuity, and Tarone would "have no right or interest therein."

The next day, an annuity was indeed purchased from Monarch Life. It is not clear who filled out the Annuity Application, dated August 2, 1984, but it was a standard Monarch Life form. Sipio's Exhibit 3. The first section is titled "Proposed Annuitant", and the name and information provided there belong to Tarone. Id.

The second section of the Annuity Application is left blank.  Id.  Unfortunately, it seeks the information which is the subject of this lawsuit.  First, it asks for "Name and Address of Applicant If Other Than Proposed Annuitant."  Id.  This section is blank.  Next, it asks for "Owner of Policy" and provides boxes to check by "Proposed Annuitant" and "Applicant."  Id.  Neither box is checked.

The third section, which is unimportant in this case, seeks information regarding retirement plans.  The fourth section, however, is labeled "Beneficiary."  Its first section reads: "Indicate beneficiary for any death benefits with ..........right reserved to change beneficiary."  Id.  The space in the middle of the section appears to give the applicant the opportunity to write "NO", in order to preclude the possibility of a change in beneficiary.  In this case, the space is not filled in.  The Primary Beneficiary box is filled in: "Estate of Annuitant – Robert J. Tarone, III."  Id.

Tarone's signature does not appear anywhere on this document, nor is his name filled into either of the two signature boxes provided; one labeled "Proposed Annuitant" and the other labeled "Applicant if Other Than Proposed Annuitant."  Both of these boxes are blank.  Immediately below the box labeled "Applicant if Other Than Proposed Annuitant", however, are the typed words "MONARCH CAPITAL CORPORATION."  Immediately below that is another box, labeled: "If a Firm or Other Organization, Signature & Title of Authorized Person."  That box is signed by an individual, whose last name is illegible, and has not been supplied by either claimant.  Under that signature are typed the words: "Vice President and Treasurer."

The first page of the policy itself is entirely pre-printed, with no room to fill in individualized information. It states, in relevant part: "In this policy, the word *you* refers to the annuitant shown below [in this case, Tarone]. *We* refers to Monarch Life Insurance Company." Id. It then says: "We will pay income to the owner during your lifetime." Id. On the pre-printed page titled "Terms of This Policy", it is provided: "**You** are the owner of this policy unless another owner has been named in the application." Id. at 3. (Bold supplied). This suggests that Tarone was the owner of the policy.

The page labeled "Terms of This Policy" also states that the application is a part of the entire annuity contract. Id. Further, it says: "During your lifetime the owner can transfer ownership of this policy or change the beneficiary." Id. at 4.

B.     The Change of Contract Form

On December 11, 2000, Monarch Life received a completed Contract Change Form signed by Tarone. Sipio's Exhibit 6. The form was one generated by Monarch Life, and had Monarch Life's name and address on its top lines. Id.

The Contract Change Form listed Robert J. Tarone as the owner of the "contract," i.e, the annuity policy. Joan A. Darlington, Tarone's mother, was listed as the Annuitant, followed by the parenthetical: "beneficiary." This was despite the fact that, as above, Mrs. Darlington was not listed as a beneficiary on the annuity contract. Tarone's estate was the beneficiary. Mrs. Darlington, however, was the beneficiary under Tarone's will.[1]

---

[1] Tarone's will, dated October 1, 1986, stated that his estate was to pass to Joan Darlington if she survived him by thirty days. Sipio's Exhibit 5. If Mrs. Darlington failed to survive Tarone, his estate would go to charity.

5

Nevertheless, the Contract Change form asked that the beneficiary be changed from Joan A. Darlington to Laura Sipio. Id. The reason for the change was given as: "Joan A. Darlington died 11/11/00." Id. On the second page of the form, entitled "Beneficiary Designation", Laura Sipio's name, social security number and address are given as that of the "Primary Beneficiary." Id. One printed section of the form reads: "This beneficiary designation cancels any and all prior beneficiary designations and settlement agreements for the contract referenced on the reverse side of this form." Id.

In a letter dated February 1, 2001, Monarch replied:

> We are in receipt of your beneficiary change request dated 12/7/2000. However based upon the terms of the Settlement Agreement, Specifically, the bottom of page 5, in the event of your death before all guaranteed payments are made the remaining guaranteed payments will be made to your estate. Note all payments will be made according to your settlement agreement and not in a lump sum to your estate. We are unable to change your beneficiary it must remain your estate.

Sipio's Exhibit 7. (Errors in original).

D.  This Action; The First Motions for Summary Judgment

During Tarone's life, Monarch Life Insurance made all payments to Tarone. After Tarone died on October 18, 2008, the Register of Wills for Bucks County appointed McEvilly as executor of his will. At that time, there were still numerous payments to be made to his beneficiary, under the SAR and the annuity policy. Since the annuity names Tarone's estate as his beneficiary, McEvilly, as executor, has taken the position that these payments should be made to the estate, which will then forward the money to the charities named in Tarone's will.

Laura Sipio, however, contends that the Change of Contract form Tarone submitted to Monarch Life shows his intent that the remaining annuity payments be made to her. She claims that Tarone, as owner of the annuity policy, had the power to change the beneficiary, and that

Monarch Life was wrong in failing to honor the Change of Contract request. The Estate denies this, maintaining that Tarone was never the owner of the annuity, and had no power to change the beneficiary.

On February 20, 2009, Monarch Life filed this interpleader action, which was assigned to Judge Dalzell. Before fact discovery was completed, the parties filed cross-motions for summary judgment, which Judge Dalzell denied in an Order and Memorandum, dated January 26, 2010.

Judge Dalzell wrote that the effect of the Contract Change Form could not be considered until it was determined whether Tarone was the owner of the annuity, with the power to change the beneficiary. Opinion of January 26, 2010 at 19, n. 15. Each claimant asked him to abide by the terms of one document, and ignore the other: Sipio claimed that the annuity policy provided that Tarone was the owner, and the Estate argued that the settlement documents precluded this. Judge Dalzell wrote: "We disagree with the parties' one-sided approaches." Id. at 15. Instead, he concluded that the SAR and the annuity policy were part of one transaction, and that they were to be construed together. Id. at 16.

Judge Dalzell wrote that the terms of these documents, read together, were "to say the least", ambiguous. Id. at 18. Therefore, the intent of the parties had to be determined from extrinsic evidence. However, Judge Dalzell concluded that neither party had provided enough extrinsic evidence to permit him to resolve the ambiguity:

> Unfortunately, Sipio and the Estate do not explore in their motions and briefs how we should read these 1984 contracts together, and they neither make arguments nor present extrinsic evidence that we can evaluate to determine how to move forward from this point.

Id. at 19. He then denied summary judgment and directed the parties to proceed with discovery.

E.  Recent Case History:  The Present Motions for Summary Judgment

On December 20, 2010, this case was referred for trial to the undersigned. After some outstanding discovery issues were resolved, I entered a Scheduling Order on December 23, 2010, setting dates for motions in limine, and scheduling trial for April 4, 2011.

On March 29, 2011, however, the Estate filed a Motion for Extension of Time to File A Supplemental Motion for Summary Judgment. In it, the Estate raised a significant argument it had made for the first time only the day before, in its motion for reconsideration of the Court's denial of one of its motions in limine.

I granted the Estate's motion to file a new motion for summary judgment, and permitted Sipio to respond. Sipio filed a response, accompanied by a cross-motion for summary judgment to which the Estate has now responded.

III.  Summary Judgment Standard

Summary judgment is warranted where the pleadings and discovery, as well as any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. Pr. 56. The moving party has the burden of demonstrating the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In response, the non-moving party must adduce more than a mere scintilla of evidence in its favor, and cannot simply reassert factually unsupported allegations contained in its pleadings. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Celotex Corp. v. Catrett, supra at 325; Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989).

When ruling on a summary judgment motion, the court must construe the evidence and any reasonable inferences drawn from it in favor of the non-moving party. Anderson v. Liberty Lobby, supra at 255; Tiggs Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987). Nevertheless, Rule 56 "mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, supra, at 323.

III. Discussion

A. The Timing of The Estate's Motion

Clearly, the Estate's Supplementary Motion for Summary Judgment was filed at an extremely late date. There is no reason why the argument raised in this motion could not have been raised at any time during the two years this case has been pending. This delay is by no means a recommended practice. Nevertheless, it is within a trial court's discretion to decide whether to consider evidence presented in an untimely motion for summary judgment. See Caterna v. United States, 319 Fed. Appx. 93, 97 (3d Cir. 2008), citing Marroquin-Manrequez v. INS, 699 F.2d 129, 134 (3d Cir. 1983) ("The scope and conduct of discovery are within the sound discretion of the trial court") and Lacey v. Cessna Aircraft Co., 932 F.2d 170, 178 (3d Cir. 1991) (A district court's "decision whether to penalize non-compliance with a deadline is entrusted to the discretion of the court that imposed it").

The factors to be considered in determining whether a district court properly exercised its discretion in excluding or admitting untimely evidence include (1) the prejudice or surprise to the opposing party; (2) the extent to which that prejudice can be cured; (3) the extent to which

9

orderly and efficient trial of the case would be disrupted; and (4) bad faith or willfulness on the part of the movant. Caterna at 98, citing Meyers v. Pennypack Woods Home Ownership Ass'n, 559 F.2d 894, 905 (3d Cir. 1977).

Here, any prejudice to Sipio has been cured by permitting her ample time to respond to the Estate's Motion. No bad faith is apparent on the Estate's part, since it clearly did not benefit from waiting two years to raise an argument which has turned out to be successful.

B.      Structured Settlement Under § 130 of the Internal Revenue Code

In its Supplemental Motion for Summary Judgment, the Estate brings the Court's attention to Internal Revenue Code ("IRC") code sections which permit the structured settlement of a personal injury action. Under this arrangement, the settling plaintiff and defendant both realize tax benefits from a third party's assuming the defendant's obligations, and then purchasing an annuity which names the plaintiff as an annuitant. In order for the tax benefits to be realized, the plaintiff cannot be the owner of the annuity.

The Honorable Samuel A. Alito (now Justice Alito) explained this thoroughly in the opinion he authored in Western United Life Assurance Company v. Hayden, 64 F.3d 833 (3d Cir. 1995):

> Structured settlements are a type of settlement designed to provide certain tax advantages. In a typical personal injury settlement, a plaintiff who receives a lump-sum payment may exclude this payment from taxable income under I.R.C. § 104(a)(2) (providing that the amount of any damages received on account of personal injuries or sickness are excludable from income). However, any return from the plaintiff's investment of the lump-sum payment is taxable investment income. In contrast, in a structured settlement the claimant receives periodic payments rather than a lump sum, and all of these payments are considered damages received on account of personal injuries or sickness and are thus excludable from income. Accordingly, a structured settlement effectively shelters from taxation the returns from the investment of the lump-sum payment.

**A key characteristic of a structured settlement is that the beneficiary of the settlement must not have actual or constructive receipt of the economic benefit of the payments**. Rev. Rul. 70-220. In a structured settlement, the settling defendant's "purchase of a[n] ... annuity contract from the other insurance company [is] merely an investment by [the settling defendant] to provide a source of funds for [him] to satisfy [his] obligation to [the plaintiff]." Id. The arrangement is "*merely a matter of convenience to the [defendant] and d[oes] not give the recipient any right in the annuity itself.*" Id. (emphasis added). Because the recipient never had actual or constructive receipt of the lump-sum amount, the recipient need not include the investment yield on that amount as taxable income. Id. Thus, the exclusion applies to the full amount of the annuity payments because the amount is received as damages on account of personal injuries. Id.

Before 1983, the utility of structured settlements was diminished by the credit risk that the recipient would have to assume. ... Because the annuity was merely a matter of convenience **and did not give the recipient any right in the annuity**, in the case of the settling defendant's default the plaintiff could not seek redress from the annuity issuer. ... This presented a problem if the settling defendant's general credit risk was high.

Congress addressed this problem by enacting I.R.C. § 130. ... [S]ection 130 allows a tax-neutral transaction in which the settling defendant assigns and a third party assumes the obligation to make periodic payments under most § 104(a)(2) structured settlements. When the third party assignee ... has a credit rating superior to that of the settling defendant, such as assignment and assumption agreement benefits a plaintiff ... by allowing her to rely on the assignee's superior credit.

64 F.3d at 830-840. (Bold supplied; some citations omitted).

Not only is such a structured settlement favorable to the plaintiff, it also benefits the defendant, which is entitled to a deduction when earnings on the policy's premium are paid to the plaintiff. In re: Monarch Capital Corporation, 130 B.R. 368, 370 (Bankcy. D. Mass 1991).

Settlements structurally identical to the one at issue here have been described in other cases as complying with IRC § § 104(a)(2) and 130. In CGU Life Insurance Company of America v. Metropolitan Mortgage & Securities Co., Inc., 131 F. Supp.2d 670 (E.D.Pa. 2001), married personal injury plaintiffs entered a Settlement Agreement and Release

11

with the insurer of a defendant, under which they were to receive periodic monthly payments. Id. at 672-673. The Settlement Agreement and Release, as here, provided that the insurer would make a qualified assignment of its liability to CGU Annuity Service Corporation, which it did, in a "Uniform Qualified Assignment" contract. Id. at 673. CGU Annuity Service Corporation then purchased from CGU Life Insurance Company of America an annuity policy to fund these obligations, as permitted by the two contracts. Id.

In interpreting the relationship between the parties to the case, the CGU court wrote: "It is clear from the language of the Settlement Agreement and the Uniform Qualified Assignment that the parties intended to enter into a structured settlement in accordance with § § 140(a)(2) and 130 of the Internal Revenue Code, 26 U.S.C. § § 104(a)(2), 130." Id. at 679.

Another case, In re: Monarch Capital Corporation, supra, even involved some of the parties to this case. As here, in In re: Monarch, a personal injury action terminated in a structured settlement embodied in a Settlement Agreement and Release, whereby Monarch Capital Corporation became the assignee of the defendant, and funded its obligation toward the plaintiff by purchasing an annuity from Monarch Life Insurance Company. 180 B.R. at 370, 371. The only substantial difference from this case is that, in In re: Monarch, the applicant was designated as 'owner' on the annuity policy. Id. at 372. Here, the "owner" block was left empty.

In deciding who owned the annuity, the In re: Monarch court decided that the parties intended to create a structured settlement under § 104(a)(2) and § 130 of the IRC, and remarked: "Section 130 ... sets forth a number of restrictions. The third party 'assignee' who assumes the tort defendant's obligation must use the annuity 'to fund' the periodic payments. Although the statute does not specify who is to be the policy owner, presumably the third party who assumes

12

the obligation must be the owner in order for that party to use the policy to 'fund' its assumed obligation." Id. at 370-371. Thus, the owner of the annuity was Monarch Capital.

Crucially, if the annuitant is deemed to own or control the lump-sum fund used to purchase the annuity, the tax benefits of the structured settlement are lost. IRS Revenue Ruling 79-220, 1979 WL 51028 (IRS RRU 1979), cited in Western Life Assurance, supra, held that, where a defendant's assignee purchased an annuity contract to fund its obligations to the plaintiff, called A: "the exclusion from gross income provided by § 104(a)(2) of the Code applies to the full amount of the monthly payments received by A in settlement of the damage suit because A had a right to receive only the monthly payments and did not have the actual or constructive receipt or the economic benefit of the lump-sum amount that was invested to yield that monthly payment." And see IRS Private Letter Ruling 8325054, 1983 WL 202680 (IRS PLR March 21, 1983) and IRS Private Letter Ruling 9017011, 1990 WL 699180 (IRS PLR April 27, 1990) (reaching the same result, citing RR 79-220).

C.      The Parties' Intention As Set Forth in the SAR

Read in the light of this authority, it is now clear that, as in CGU and In re: Monarch, the parties to Tarone's SAR intended to create a structured settlement under § 104(a)(2) and § 130 of the IRC. The SAR contains this language: "The parties hereto acknowledge and agree that the Transamerica Insurance Company may make a 'qualified assignment' **within the meaning of § 130(c) of the Internal Revenue Code of 1954, as amended**, of all of its liability to make the periodic payments required herein." SAR at ¶ 4. (Bold supplied).

13

The Qualified Assignment and Consent, which embodies the "qualified assignment within the meaning of § 130" referred to in the SAR, also states in its introductory language: "The Settlement Agreement and Release provides that Assignor shall make certain periodic payments to Obligee, **such payments constituting damages within the meaning of Section 104(a)(2) and 130(c) of the Internal Revenue Code of 1954, amended ("Code");** and the Settlement Agreement and Release provides that Assignor may make a "qualified assignment" (within the meaning of Code Section 130(c)) of its liability to make said periodic payments." (Bold Supplied).

As quoted above, the Qualified Assignment and Consent further states:

> Although Obligee [Tarone] is and shall be only a general creditor of Assignee [Monarch Capital], Assignee may fund the liabilities it assumes hereby by purchasing a "qualified funding asset" within the meaning of Code Section 130(d). Any such "qualified funding asset" shall be the sole property of Assignee; Obligee shall have no right or interest therein.

Qualified Assignment and Consent at ¶ 4.

This language is not ambiguous. The parties to the SAR intended to create for Tarone a structured settlement under § 104(a)(2) and § 103(c) of the IRC, as described by the Court of Appeals for the Third Circuit in <u>Western United Life</u>, to obtain tax benefits both for Tarone and for Transamerica. This leads directly to the conclusion that the above-quoted language in ¶ 4 of the Qualified Assignment and Consent, specifying that Monarch Capital would own the annuity, and that Tarone was to have "no right or interest" in it, was an essential feature of the structured settlement.

D.     The Intention of the Parties to the Annuity Contract

Under Pennsylvania law, the paramount goal of contract interpretation is to determine the intent of the parties. NOVA Chemicals, Inc. v. Sekisui Plastics Co., 579 F.3d 319, 323 (3d Cir. 2009). For this reason, Sipio cannot show that Tarone was the owner of the annuity policy simply by demonstrating that the policy language suggests that this was so. She would also have to demonstrate that it was the intention of the parties that Tarone be the owner.

In light of the Estate's convincing showing that the parties to the SAR specifically intended that Monarch Capital own the annuity, and that Tarone *not* own it, this would require proof that the parties, having carefully constructed in the SAR a tax-beneficial structured settlement under §104(a)(2) and § 130 of the IRC on August 1, 1984, actually changed their minds within 24 hours, and decided to abandon that scheme so that Tarone could own the annuity. Yet, they did not go back and alter the SAR documents. This simply is not credible.

Sipio has not shown that this occurred. Moreover, the evidence would not support such a claim. As opposed to the SAR documents, which are quite specific, Tarone's status as the owner under the annuity contract is simply a default, dependent on pre-printed language, i.e., "In this policy, the word *you* refers to the annuitant shown below" and "You are the owner of this policy unless another owner has been named in the application." The box marked "Owner of Policy" was not checked off "annuitant": it was left blank. Tarone did not even sign the annuity application, which seems inconsistent with any intent to make him the applicant and/or the owner. Neither did his attorney sign for him.

On the contrary, the annuity application was signed by the Vice President and Treasurer of Monarch Capital Corporation. This is completely consistent with the intention of the parties that Monarch Capital own the annuity, as set forth with precision in the terms of the SAR. Thus, Tarone's status as "owner" seems to be nothing more than a result of the parties having inadvertently ignored the "Owner of Policy" box.

Until the Estate brought forward in its Supplemental Motion for Summary Judgment the facts respecting tax consequences of structured settlements under § § 104(a)(2) and 130 of the IRC, it did not seem implausible that the parties could have intended that Tarone own the annuity. Therefore, the inconsistency between the SAR and the annuity created an apparent ambiguity when the documents were considered as a single transaction. Now, however, in the context of the information brought forth, no ambiguity appears. Clearly, the intention of all parties at the time the agreements were entered was that Monarch Capital would purchase an annuity, and that Tarone – although the annuitant – was to be specifically excluded from ownership, for his own tax-related benefit.

As a result of this, Tarone did not have the power to change the beneficiary from his Estate to his sister, Laura Sipio. The annuity policy explains this clearly, maintaining the distinction between the "owner" and the pronoun "you", which refers to the annuitant: "During **your** lifetime **the owner** can transfer ownership of this policy or change the beneficiary. To do this, **the owner** must send us written notice of the change in a form satisfactory to us." Sipio's Exhibit 3 at page 4.[2] (Bold supplied).

---

[2] Sipio argues that Monarch Life treated Tarone as the owner for 25 years, by sending the monthly payments to him, where the annuity provides that they are to be made to "the owner." Judge Dalzell, however, disposed of that argument when it was raised in the first cross-motions for summary judgment by accurately observing that the SAR

E.    Sipio's Motion for Summary Judgment

Although Sipio's response to the Estate's motion is labeled a Cross-Motion for Summary Judgment *and* opposition brief, most of it is actually opposition, particularly her argument that issues of material fact remain to be resolved by the jury.[3] However, Sipio also maintains that Monarch "has waived any and all rights that it has in the annuity and thus cannot be deemed the owner of the contract." Indeed, it is set forth in the complaint of this action that: "Monarch claims no interest or title to the annuity or the property at issue herein." Complaint at ¶ 40.

This argument cannot succeed. Sipio has confused Monarch Life, which filed this interpleader action, with Monarch Capital which (a) is called the owner of the policy in the SAR; (b) signed the annuity policy; and (c) is not a party to this action, and has never been deposed by any party to this action, and has therefore made no representation whatsoever as to whether it owns the annuity.

Finally, Sipio's argument that Tarone substantially complied with Monarch's requirements for changing the annuity beneficiary need not be addressed, since, as Judge Dalzell observed, the issue could not be reached unless it was determined that Tarone had the power to change the beneficiary. He did not have this power.

---

not only provides that payments are to be made to Tarone, but specifies that, although "the Transamerica Insurance Company and/or the assignee shall be the owner of any ... annuity policy", nevertheless: "the Transamerica Insurance Company and/or the assignee may have the annuity company mail payments directly to Plaintiff." SAR at 7. In any event, Monarch Life could not waive Monarch Capital's rights as owner.

[3] As discussed, I have concluded that the intent of the parties respecting the ownership of the annuity – and, therefore, the right to change the annuity beneficiary – can be decided on the language of the documents comprising the transaction at issue. Accordingly, I do not agree that there are outstanding issues of fact remaining in this case. Sipio has also pointed out that most of the authority upon which the Estate relies, including the IRS sections, the IRS letter rulings, and In re: Monarch Capital, is not binding upon this Court. This is true. Nevertheless, as discussed above, all of this authority is of importance in discerning the intention of the parties to the documents in this case.

In accordance with this Opinion, I will grant the Estate's Motion for Summary Judgment. I will direct Monarch Life Insurance Co. to pay the remaining proceeds of the annuity policy to the Estate of Robert J. Tarone, III, and will further order the moneys paid by Monarch Life Insurance Co. into escrow during the pendency of this case be paid to the Estate of Robert J. Tarone, III.

BY THE COURT:

/s/Jacob P. Hart
_____
JACOB P. HART
UNITED STATES MAGISTRATE JUDGE